## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LELAND W. HACKETT,**

     **Plaintiff,**

**vs.**                                                            **Civ. No. 08-306 MCA/RHS**

**ARTESIA POLICE DEPARTMENT,**
**ARTESIA MAYOR PRO TEM PHILLIP BURCH;**
**ARTESIA MUNICIPAL COURT JUDGE KAYE KIPER;**
**FIFTH JUDICIAL DISTRICT COURT CLERK JOYCE HATFIELD;**
**ARTESIA POLICE DEPARTMENT OFFICER RICARDO HUERTA;**
**ARTESIA POLICE DEPARTMENT OFFICER PEDRO QUINONES;**
**ARTESIA POLICE DEPARTMENT OFFICER CLARKE;**
**PECOS VALLEY DRUG TASK FORCE AGENT CARROL CAUDILL;**
**PECOS VALLEY DRUG TASK FORCE AGENT VICTOR J. RODRIGUEZ;**
**in their individual capacities,**

     **Defendants.**

### MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the *Artesia Defendants' Motion for Summary Judgment on Plaintiff's Federal Law Claims*, filed January 28, 2009 (Doc. 100); on the *Artesia Defendants' Motion for Summary Judgment on Plaintiff's State Law Claims*, filed January 28, 2009 (Doc. 101); on *Defendants Huerta, Quinones, Clarke, and Rodriguez's Motion for Summary Judgment on Plaintiff's State Law Constitutional Claims*, filed February 27, 2009 (Doc. 112); on *pro se* Plaintiff Leland Hackett's *Motion for Leave to File Surreplies*, filed March 5, 2009 (Doc. 113); on *pro se* Plaintiff Leland Hackett's *Motion for Clarification and Entry of Final Judgment* (Doc. 122); and on *pro se* Plaintiff Leland Hackett's *Motion to Correct the Docket* (Doc. 124).  After considering the parties' arguments at a hearing held on July 14, 2009, the Court issued oral rulings granting the motions for summary judgment and vacating the trial setting.  The Court indicated that it would issue a written opinion addressing in detail the merits of the pending motions.

Three distinct events form the basis for the claims brought by Plaintiff Leland Hackett.  Each incident will be reviewed below in some detail.  The following facts are either undisputed or are submitted as factual by Hackett.

**The First Incident:  February 26, 2006, 26th and Main Street, Artesia, New Mexico:**
According to Hackett, he was driving to work that morning and pulled into a convenience store.  *See* Doc. 106, Ex. 1 ¶ 2 (Hackett's affidavit).  Hackett admits that he drove to the store without wearing his seatbelt.  *See* Doc. 100, Ex. D at 3, 14 (February 27, 2006 Transcript of Officer Huerta's belt tape during stop and pat-down [hereinafter "Feb. 27, 2006 Tr."]).  Hackett and his passenger had already exited Hackett's extended-cab truck when Officer Huerta pulled in behind him with his emergency lights on.  Officer Huerta ordered the men to get back into Hackett's truck.  *See* Doc. 106, Ex. 1 ¶ 2.  As Officer Huerta approached the truck, Hackett "reached for [his] identification."  *Id.* ¶ 3.  Hackett did not reach into his pocket for a wallet or into the glove compartment located in the front of the truck; instead, he reached "in the back" seat area of the truck as Officer Huerta approached the truck.  Feb. 27, 2006 Tr. at 2, 7.  Officer Huerta became concerned that Hackett could be reaching for a weapon.  *See* Doc. 100, Ex. A at 2.  He ordered Hackett to exit the vehicle and turn around, and he then grabbed and held Hackett's thumbs together behind his back.  *See* Doc. 106, Ex. 1 ¶ 5.  Officer Huerta asked Hackett if he had any weapons, to which Hackett responded, "I don't have any weapons.  I got a pocket knife."  Feb. 26, 2006 Tr. at 2.  He then asked Hackett the location of the knife.  *See id.*  Hackett told him it was in his pants' pocket, and Officer Huerta said, "I'm going to reach for it, okay?" to which Hackett responded, "It's over here on my right side."  *Id.* at 3.  Hackett then asked what was going on; Officer Huerta told him that he had not been wearing his seatbelt; and Hackett agreed that he had not.  *See id.*  The officer then asked, "Do you have anything that's going to stick me or poke me?", and Hackett responded, "I don't think so."  *Id.*  Officer Huerta

2

asked, "Can I pull everything out?", to which Hackett responded, "Well, I think so, yeah." *Id.* Officer Huerta pulled the pocket knife and a glass pipe that was "burned on one end and [had a] crystal like substance on the other end" out of Hackett's pocket. *See* Doc. 100, Ex. A at 2. When Officer Huerta asked about the pipe, Hackett said he did not know and that he had recently found it. *See* Feb. 26, 2006 Tr. at 4. Hackett's passenger remained seated in the truck. Officer Huerta released Hackett from the thumb hold and asked him if he had any weapons in the truck, to which Hackett replied, "no." *Id.* at 5.

Because the officer believed the glass tube to be a methamphetamine pipe, he contacted dispatch to obtain an amphetamine or methamphetamine field-test kit. *See id.* at 17. Officer Huerta performed an amphetamine field test on the contents of the glass tube and, according to Hackett, announced, in a "loud voice in the convenience store parking lot that the test was positive for methamphetamine." Doc. 106, Ex. 1 ¶ 15.

Although he had "lived and worked in Artesia for many years," *id.* ¶ 7, Hackett did not have a New Mexico driver's license. Officer Huerta learned from dispatch that Hackett's Colorado driver's license had been suspended, *see* Doc. 100, Ex. A, although Hackett produced an "international driver's permit" that he had ordered off of a site on the internet. *See id.*, Ex. D at 14. Officer Huerta issued citations for driving with a suspended licence, possession of drug paraphernalia, and a seat-belt violation. *See* Doc. 100, Ex. A.[1] Hackett challenged the citation for possession of drug paraphernalia. *See* Complaint ¶ 41; Doc. 100 ¶ 19. The glass-pipe and field-test evidence was suppressed, and the case was dismissed. *See id.*

Mr. Hackett challenged the suspended-license citation in Artesia Municipal Court, and his

---

[1] Hackett was not arrested in connection with the First Incident, but was allowed to proceed on his way after receiving the citations.

subsequent arrest for failing to pay fees assessed against him associated with that litigation.  *See* Complaint ¶¶ 36-53. Former Defendant, Municipal Court Judge Kaye Kiper,[2] "deferred" Hackett's charge of driving with a suspended Colorado driver's license, and ordered him to pay $28 in "court fees."  Doc. 106, Ex. 7.  According to Hackett and his witness, Judge Kiper informed Hackett that his "sentence" was deferred and he could pay the court costs "whenever [he] could afford it."  Doc. 106, Ex. 1 ¶ 20; Doc. 106, Ex. 6 ¶ 2.  But Hackett also states he did not sign the court-issued "Agreement to Pay Fine and Fees" that he admittedly was given at the May 30, 2006 hearing.  *See* Complaint ¶ 80. The Agreement states that he had been "convicted" of "unlawful Use of License Suspended/Revoked;" that he must "pay in full by 06-21-2006" the "$28.00 fine" or call the court; and that, if he failed "to pay the fine in accordance with this agreement [he could] be prosecuted for Contempt of Court and confined in jail until [he made] such payment."  Doc. 106, Ex. 7.  It is undisputed that Hackett failed to pay the $28 by June 21, 2006, and as a result, on August 7, 2006, Judge Kiper signed a bench warrant for his arrest.  *See* Doc. 100, Ex. H.

**The Second Incident: August 15, 2006:**  On August 15, 2006, Officer Huerta spotted Hackett standing on the front porch of a mobile home.  He called dispatch and confirmed that there was an active warrant for Hackett's arrest.  *See* Doc. 100, Ex. J at 1-2.  Officer Huerta arrested Hackett, and while conducting a search incident to arrest, found another "glass meth smoking pipe with burned residue" and "two clear plastic bags containing a white crystal like substance" in Hackett's pockets. *See id.* at 2. Officer Huerta transported Hackett to the Artesia Detention Center, and Hackett paid the outstanding $28 and was released within two hours.  *See* Doc. 100, Ex. K.

---

[2]     All claims against Judge Kiper were dismissed pursuant to a *Memorandum Opinion and Order* issued December 24, 2008.  *See* Doc. 82.  Claims against the Fifth Judicial District Court Clerk, Joyce Hatfield, relating to Hackett's attempts to appeal Judge Kiper's order, have also been dismissed.  *See* Doc. 83.

Officer Huerta contacted the Pecos Valley Drug Task Force ("PVDTF") to take over the investigation because of what he believed were controlled substances in the bags.  *See id.* Accepting Hackett's version of the subsequent events as true, before he was released, Officer Huerta gave Hackett PVDTF Agent Carroll Caudill's telephone number and told him that Hackett would be charged "with fourth-degree felony charges if [he] did not call Agent Caudill."  Doc. 106, Ex. 1 ¶ 27.  Hackett attempted to talk to Agent Caudill after he was released from jail, *see id.* ¶ 30, but he never agreed to provide information to the PVDTF.  *See* Complaint ¶ 78.  Hackett contends that he was injured by being "threatened and coerced into consenting to call Caudill," Doc. 106 at 7 ¶ 18, and alleges a conspiracy to try to put him in "jeopardy" by attempting to force him to be an informant. *See* Complaint ¶ 78.  The record and the briefs are silent regarding whether Hackett was charged with any drug offenses arising from the search incident to his arrest on August 15, 2006.

On August 28, 2006, Hackett sent a letter to the mayor pro tem of Artesia, Phillip Burch, therein complaining of the First and Second Incidents and stating his intent to sue.  *See* Complaint, Ex. J.  He received a letter of acknowledgment, advising him that his letter would be forwarded to the City's insurance carrier.  *See id.* Ex. L.  On May 7, 2007, Hackett sent a second letter, *see id.* Ex. K, reiterating his complaints about the First and Second Incidents, and adding allegations regarding the Third Incident, which is described below.

**The Third Incident:  March 18, 2007:**  On March 18, 2007, at around 3:40 a.m., Defendant Officer Pete Quinones observed a Jeep Cherokee with an expired license plate driving on the Artesia city streets.  *See* Doc. 100, Ex. L at 2.  He pulled the Jeep over and observed that there were three occupants.  *See id.*  According to Hackett, his front-seat passenger, Robert Walters, "had some methamphetamine with him [that] he dropped [] between the seats of the vehicle" prior to the stop. Tr. of July 14, 2009 Hearing at 7, lns. 23-25.  Because Hackett was driving, Officer Quinones asked

5

him for his driver's license, insurance, and registration and explained why he conducted the stop. *See id.* Hackett responded that he had no documentation to show that the vehicle was registered or insured; that he did not have any form of identification; and that he "had international driving privileges." *Id.* Hackett stated that he showed Officer Quinones the Jeep's certificate of title, *see* Doc. 106, Ex. 1 ¶ 37, which lists the "JVW Trust" at an address on Main street in Artesia as the Jeep's owner, *see* Doc. 106, Ex. 14. Hackett reported his address to Officer Quinones as Rocking Red Road, and neither of the passengers' addresses were on Main street. *See* Doc. 100, Ex. L at 1. When dispatch informed Officer Quinones that Hackett had "a suspended license out of Colorado," and Officer Quinones could not ascertain through NCIC whether the Jeep was insured, Officer Quinones decided to have it towed. He explained that it was being towed because there were no documents to show that the Jeep was registered or insured. *Id.* at 3.

While Officer Quinones wrote citations to Hackett for driving with a suspended license and having no registration or insurance, Defendant Officer Robert Clarke arrived and began conducting a tow-sheet inventory of the Jeep. *See id.* While performing the inventory, Officer Clarke observed a Visine bottle inside an open compartment below the glove box. *See* Doc. 100, Exs. N, O. According to Officer Clarke, he suspected that the bottle might contain liquid methamphetamine because he had learned in training that "controlled substances were being concealed in Visine bottles." *See* Doc. 100, Ex. P at 2. He decided to test the bottle's contents using a field-test kit for methamphetamine, and he read the results of the test as being positive. *See id.* The "instructions for use" located on the field test package stated: "WARNING These tests are NOT designed for use with liquid samples." Doc. 106, Ex. 20. Officer Clarke reported the allegedly positive results to Officer Quinones, who then arrested Hackett.

Officer Quinones contacted Defendant Agent Victor Rodriguez of the PVDTF to advise him

that evidence of a controlled substance had allegedly been discovered in the Jeep. *See* Doc. 100, Ex. L at 3. Agent Rodriguez took over the investigation and contacted an assistant district attorney, who instructed him to obtain a search warrant for the Jeep based on the allegedly positive field-test results. *See* Doc. 100, Ex. Q at 3, 4. Agent Rodriguez obtained the search warrant and then re-tested the contents of the Visine bottle "to ensure that Officer Clarke had properly performed, and read the results of the field test." *Id.* at 2. Officer Rodriguez's test of the contents were negative for methamphetamine. *See id.* As a result, Hackett was released without being charged with any crime and without appearing before a magistrate for prosecution. *See* Complaint, Ex. K; Doc. 100, Ex. Q at 2.

The Jeep was subsequently towed to a towing yard. At this deposition, Hackett testified that he sought to retrieve the vehicle a month after his arrest but did not have the money to pay the fees. *See* Doc. 100, Ex. I at 9. In his brief, however, Hackett contends that no one has retrieved the Jeep out of "concern that the Artesia Police Department may have tampered with the vehicle or planted drugs in the vehicle." Doc. 106 at 9.

A review of applicable legal standards follows.

## I. APPLICABLE LEGAL STANDARDS ON FEDERAL CLAIMS.

Section 1983 of Title 42 of the United States Code provides, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Section 1983 is not an independent source of substantive rights; rather it is a mechanism for enforcing federal rights conferred elsewhere. *See Albright v. Oliver*, 510 U.S. 266,

7

271 (1994).  Accordingly, an analysis of Hackett's federal civil-rights claims necessarily begins by

identifying the specific constitutional rights allegedly infringed.  *See Graham v. Connor*, 490 U.S.

386, 393-94 (1989).  Hackett contends that his Fourth, Fifth, and Fourteenth Amendment rights were

violated.  *See* Complaint at 1.

Hackett has sued all of the individually-named defendants in their individual capacities.

Qualified immunity protects "government officials performing discretionary functions" and shields them from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).  Qualified immunity serves to insulate public officials "from undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806.

In qualified immunity cases at the summary judgment stage, a plaintiff must clear two hurdles.  The plaintiff must demonstrate on the facts alleged (1) that the defendant violated his constitutional or statutory rights, and (2) that the constitutional right was clearly established at the time of the alleged unlawful activity.  *Pearson v. Callahan*, ---U.S. ----, ---- - ----, ----, 129 S. Ct. 808, 815-16, 818, 172 L. Ed. 2d 565 (2009); *Saucier v. Katz*, 533 U.S. 194, 200, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

Recognizing the complexities of resolving the question of constitutional liability, the Supreme Court allows us the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 129 S. Ct. at 817-18; *see Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009) (explaining that *Pearson* granted discretion to determine which qualified immunity prong to address first).

. . . .

A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right.

*Swanson v. Town of Mountain View, Colo.*, --- F.3d ----, 2009 WL 2516315, *2-*3 (10th Cir. 2009).

But "officials can still be on notice that their conduct violated established law even in novel factual

circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The "salient question" is whether the state of the law at the time of the incident gave the defendants "fair warning" that their conduct was unconstitutional. *Id.* "The core inquiry under any § 1983 action . . . is whether the plaintiff has alleged an actionable constitutional violation." *Becker v. Kroll*, 494 F.3d 904, 914 (10th Cir. 2007).

When, as here, a defense of qualified immunity has been raised in the context of a Fourth-Amendment search or seizure (and in a pre-trial claim for malicious prosecution), the Court must decide whether the defendant conducted a search or seizure that was "unreasonable" under the Fourth Amendment. *See id.* Reasonableness depends upon the circumstances, *i.e.,* whether a person was temporarily stopped; temporarily stopped and patted down; or stopped, arrested and searched.

> Under our cases, a traffic stop is valid under the Fourth Amendment if it is "based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (citation omitted). And our cases are clear that the reasonableness of the traffic stop is an objective inquiry. We do not consider the subjective motivations of law enforcement-those motivations are irrelevant. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). Instead, the "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Id.* (quotation omitted).

*Swanson*, --- F.3d ----, 2009 WL 2516315, *3. If a stop is reasonable at its inception, a court next asks "whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007). That analysis assesses "the scope of the officer's actions and balanc[es] the motorist's legitimate expectation of privacy against the government's law-enforcement-related interests," *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001), viewed "through a filter of common sense and ordinary human experience," *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) (internal quotation marks omitted).

9

[W]hen police officers stop a vehicle to investigate its occupants, "[p]olice officers are authorized to take reasonable steps necessary to secure their safety and maintain the status quo." *United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006) (quoting *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998)). Not surprisingly, the Supreme Court has recognized that passengers may present a risk to officer safety equal to that of the driver. *See Maryland v. Wilson*, 519 U.S. 408, 413-14, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997). Thus, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id*. at 415, 117 S. Ct. 882.

" 'In some circumstances,' an officer may go further and conduct a pat-down search for weapons." *United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir.) (quoting *Garcia*, 459 F.3d at 1063), *cert. denied*, --- U.S. ----, 129 S. Ct. 167, 172 L. Ed. 2d 121 (2008). "The purpose of the limited pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Id.* (quotations omitted); *see also United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007) ("Officer safety is the primary objective justifying an officer's right to perform a pat-down search.").

Standards that the Supreme Court established in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), govern the application of the Fourth Amendment to pat-down searches. In *Terry*, the court recognized that there is no "ready test" to determine the reasonableness of a search or seizure other than balancing the need to search or seize with the invasion that the search or seizure entails. *Id.* at 21, 88 S. Ct. 1868 (citation omitted). We have held that an officer may conduct a pat-down search "if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous." *Sanchez*, 519 F.3d at 1216 (citation omitted); *see also Arizona v. Johnson*, --- U.S. ----, 129 S. Ct. 781, 787, 172 L. Ed. 2d 694 (2009) ("[O]fficers who conduct routine traffic stop[s] may perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous." (quotation marks and citation omitted)). "The reasonable suspicion required to justify a pat-down search represents a minimum level of objective justification. . . . Reasonable suspicion is based on the totality of circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Rice*, 483 F.3d at 1083 (quotation marks and citations omitted). "[A] court may not engage in a sort of divide and conquer analysis by evaluating and rejecting each factor in isolation." *United States v. Cheromiah*, 455 F.3d 1216, 1221 (10th Cir. 2006) (quotation marks omitted). A court must examine whether under a totality of the circumstances, a "reasonably prudent" officer "would be warranted in the belief that his safety . . . was in danger." *Terry*, 392 U.S. at 27, 88 S. Ct. 1868; *see also Rice*, 483 F.3d at 1083. An officer's subjective intent or good faith do not affect the reasonableness of his actions. *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996).

*United States v. Lazos*, No. 07-2230, 314 Fed. Appx. 127, *131-32, 2009 WL 449168, **3-**4 (10th

Cir. Feb. 24, 2009).

"[T]he risk to officer safety is heightened by the confrontational nature" of a traffic stop. *Rice*, 483 F.3d at 1083; *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (noting the large number of officers who are assaulted and killed every year while conducting traffic stops and stating, "[i]t would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop"). "The reasonable suspicion required to justify a pat-down search represents a minimum level of objective justification . . . it falls considerably short of satisfying a preponderance of the evidence standard." *Rice*, 483 F.3d at 1083 (citations and internal quotation marks omitted).

> Whether a situation indicates probable cause for arrest depends on an officer's subjective understanding of the facts, as well as the objective application of the law to those facts. While an officer's reasonable but mistaken understanding of the facts justifying a search or seizure does not negate the legitimacy of a probable cause determination, an officer's reasonable but mistaken understanding of the applicable law he is enforcing does. *United States v. DeGasso*, 369 F.3d 1139, 1144-45 (10th Cir. 2004). In *DeGasso*, for example, a police officer reasonably but incorrectly interpreted state law as forbidding motorists to illuminate their fog lights during daylight hours. This Court held that such a mistake about the "law he is charged with enforcing" could not support probable cause or provide reasonable suspicion. *Id.* at 1144. By contrast, in *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990), the Supreme Court held that a police officer's reasonable mistake of fact does not negate probable cause, noting that the Fourth Amendment does not require "factual accuracy." It gave the example of a search incident to arrest, noting that such an arrest would be lawful even if it was based on misidentification. *Id.*

*Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009).

## II.  ANALYSIS OF FEDERAL CLAIMS.

### A.  The First Incident - February 26, 2006 Stop and Pat-down.

#### 1.  The reasonableness of the traffic stop.

Hackett contends that at its inception, the "traffic stop was in reality a pretextual traffic stop perpetrated by Officer Huerta with the authorization of the Artesia Police Department and the Pecos Valley Drug Task Force in order to search Plaintiff to see if he had on his person any weapons, and in the course of the search to discover if Plaintiff also had drugs on his person."  Complaint ¶ 62. The Defendants argue that the stop was justified at its inception because Officer Huerta observed a seat-belt violation.  It is undisputed that Hackett was not wearing a seat belt and that the failure to wear a seat belt qualifies as a traffic violation.  The traffic stop was therefore valid at its inception under the Fourth Amendment as a matter of law because it undisputedly was "based on an observed traffic violation," *Swanson*, 2009 WL 2516315, *3 (internal quotation marks omitted), and allegations of subjective pretext are irrelevant.

## 2.  The reasonableness of the scope of the detention.

Hackett next challenges the scope of the detention.  He complains that "Officer Huerta displayed a show of force" first by blocking his truck, then by ordering him to return to his truck, and finally by requiring him to exit the truck.  *See* Complaint ¶ 64.  He further argues that, because this was a traffic stop, questions about weapons were not permissible.  *See id.* ¶ 63.

But Hackett's contentions are contrary to settled authority that temporarily detaining a vehicle during the course of a traffic stop does not amount to a Fourth-Amendment violation.

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation.  The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop.  Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.

*Arizona v. Johnson*, __ U.S. __, __, 129 S. Ct. 781, 788 (2009).  Because Officer Huerta had probable cause to detain Hackett for a traffic violation, he was also justified in preventing him from departing for the duration of the stop.

12

With respect to Officer Huerta ordering Hackett to get into or out of his truck, the Supreme Court of the United States has noted that, once a vehicle is lawfully detained for a traffic violation, the

> only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it.  Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a "'petty indignity.'" *Terry v. Ohio*, *supra*, [392 U.S.] at 17.  What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety.

*Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977).  Thus, while being required to get into or out of a vehicle during a valid traffic stop constitutes a "mere inconvenience", it does not seriously intrude on any constitutionally protected right.  "The risk of harm to both the police and the occupants [of a stopped vehicle] is minimized if the officers routinely exercise unquestioned command of the situation." *Maryland v. Wilson*, 519 U.S. at 414.  As a matter of law, it was reasonable to initially order Hackett to return to the truck so that Officer Huerta could issue a traffic violation to him, and it was also reasonable, for officer safety, to ask Hackett to get back out of the truck after Hackett had reached into the back seat area as Officer Huerta approached.  The Court concludes that ordering Hackett to get into or out of his truck after the lawful traffic stop does not constitute a Fourth-Amendment violation.

Hackett's claim that Officer Huerta was not permitted to ask him about weapons is also contrary to case authority.

> Given the dangers inherent in all traffic stops, we hold that the government's interest in officer safety outweighs a motorist's interest in not being asked about the presence of loaded weapons. This balance tips in the government's favor even when the officer lacks particularized suspicion that the motorist possesses loaded weapons and regardless of whether the officer subjectively fears the motorist.

*United States v. Holt*, 264 F.3d 1215, 1226 (10th Cir.  2001).  In short, based on the undisputed facts,

the scope of the stop did not exceed what was reasonable for the circumstances as a matter of law.

### 3. The pat-down search for weapons.

Hackett next contends that "thumb-cuffing" is an arrest and that Officer Huerta had no "justifiable reason to thumb-cuff and frisk [him]" for weapons, making the pat-down search for weapons unconstitutionally unreasonable. Doc. 106 at 3-4. According to Hackett, when he reached into the back of his truck, he was simply attempting "to retrieve identification, registration, and insurance documents and did not make any 'furtive' movements." *Id.* at 3. But instead of just reaching for his wallet or the glove compartment, where identification and insurance documents are customarily kept, *see South Dakota v. Opperman*, 428 U.S. 364, 372 (1976) (noting that "standard inventories often include an examination of the glove compartment, since it is the customary place for documents of ownership and registration"), Hackett reached into the *back* of his truck as Officer Huerta approached. Hackett's unusual behavior legitimately raised concerns that he could have been reaching for a weapon. "[E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of the circumstances." *United States v. Hishaw*. 235 F.3d 565, 570 (10th Cir. 2000) (internal quotation marks omitted).

Hackett argues that Officer's Huerta's safety concerns were "nonsensical" and belied by his failure to also search the passenger. However, there is no evidence that the passenger made any sudden or unusual movements upon seeing Officer Huerta approach. Thus, the fact that Officer Huerta patted down the only person making what appeared to be a furtive movement supports a conclusion that the pat-down was reasonable for officer safety. The reasonable suspicion Officer Huerta had to conduct a pat-down search of Hackett is in no way diminished by the fact the he did not also search the passenger.

14

The Court concludes, as a matter of law, that briefly holding Hackett's thumbs (which qualifies as a "seizure" but not as an "arrest"), and beginning to conduct a pat-down search for weapons was justified by officer-safety concerns. Even though it was a daylight stop, "dangers [are] inherent in all traffic stops." *Holt*, 264 F.3d at 1226 . Further, upon questioning, Hackett stated that he was carrying a pocket knife.  While Officer Huerta may have reacted more protectively than another officer, in the situation where (I) Huerta was conducting an inherently dangerous traffic stop; (ii) the seizure was brief; (iii) there is no claim that Huerta used painful force; (iv) the belt-tape recording established that Huerta explained his concerns regarding weapons because of Hackett's unusual behavior of reaching into the back of his truck while Officer Huerta was approaching; and (v) where Hackett admitted to having a knife in his pocket, the Court concludes that Huerta harbored "an articulable and reasonable suspicion" that Hackett was armed and potentially dangerous, and the pat-down was reasonable.  *See Lazos*, 314 Fed. Appx. at *131.

Hackett next claims that because he did not voluntarily consent to the removal of items from his pockets, the search was unconstitutionally unreasonable.  *See* Doc. 106 at 4-5.  He alleges that "by way of restraint and coercion, [he] felt that he was not free to deny consent to Huerta."  *Id.* at 5.  But "[d]uring an investigative detention, police officers are authorized to take reasonable steps necessary to secure their safety."  *United States v. Sanchez*, 519 F.3d 1208, 1215 (10th Cir. 2008) (internal quotation marks omitted).  "The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence."  *Id.* at 1216 (internal quotation marks omitted).  Thus, it has long been recognized in the Tenth Circuit that "when conducting a *Terry* stop, an officer who reasonably believes that a detainee is armed and could gain immediate control of a weapon may search for the weapon and separate the detainee from any weapon that is found."  *United States v. Malouff*, 14 Fed. Appx. 975, 979 (10th

Cir. 2004).  Officer Huerta's suspicion that Hackett was armed was confirmed when Hackett stated that he had a knife.  Notwithstanding Hackett's arguments to the contrary, a pocket knife constitutes a weapon.  *See United States v. Brakeman*, 475 F.3d 1206, 1213 (10th Cir. 2007).  A pat-down search to locate and remove the weapon, according to the authorities cited above, is permissible to ensure the safety of the officer.  Furthermore, the search did not have to be confined to the weapon that Hackett professed to have; Officer Huerta was justified in searching for any and all weapons Hackett may have had on his person.  *See id.* (noting that, when a suspect states he is carrying a particular weapon, the officer is "not confined to finding the single weapon [the detainee] professed to have," nor is he "required to assume that the suspect is carrying no other weapons").

The pat-down search and removal of the knife was justified by a reasonable suspicion that Hackett was armed and by his subsequent statement that he had a knife.  Officer Huerta did not also need to obtain Hackett's consent before searching Hackett's pocket and removing the knife to ensure his safety.

### 4.  The field test for amphetamine.

Hackett next challenges as an illegal search Officer Huerta's actions in conducting a field test for methamphetamine, which he claims was performed improperly.  However, Hackett's field-test claim is not actionable under the Fourth Amendment because a chemical test for illegal drugs it is not recognized as a "search."  *See United States v. Jacobsen*, 466 U.S. 109, 123 (1984) ("A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.").  The result of the test, whether negative or positive, does not matter for Fourth-Amendment purposes.  *See id.* at 122-23.  Thus, Hackett's arguments implying that the test was performed or read improperly does not state a claim under the

Fourth Amendment.[3]

### 5.   The citation for suspended license.

Hackett also challenges Officer Huerta's actions in issuing a citation for driving with a suspended license.  *See* Doc. 106 at 5, 12.  The nature of his objection to the citation is not entirely clear, but it appears to center on his allegation that his Colorado license was not suspended, but rather was expired.  In connection with this claim, he states: "Without authority, Huerta issued to Plaintiff a citation for driving with a suspended license.  The NCIC report, dated 2/27/2006 shows that Plaintiff's Colorado driver's license was expired on 04/24/1998."  Doc. 106 at 5. A review of the report Hackett submits, however, shows that Hackett had been issued only a 60-day license and his "regular license status" showed "suspend non-resident violation." Doc. 106, Ex. 5.   While Hackett does not state any specific constitutional basis for his claim, construing his pleadings and arguments liberally, it appears he is arguing that the traffic citation was issued erroneously. However, because Hackett was convicted in state court on this citation and he has failed to allege or show that the conviction has been reversed or set aside, any associated constitutional claims are not ripe for review and must be dismissed.  *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that, where a § 1983  plaintiff has been convicted and is challenging the prosecution leading to that conviction by trying to recover damages for the allegedly unconstitutional conviction, a § 1983 claim does not mature until the conviction has been invalidated, and the complaint must be dismissed).

### 6.   Conspiracy.

Finally, Hackett suggests that there is a genuine issue of material fact as to the existence of

---

[3]  In contrast to the field test performed during the Third Incident, discussed below, this field test did not lead to an arrest.

a conspiracy between members of the Artesia Police Department and Officer Huerta that violates 42 U.S.C. § 1985(3).   But § 1985(3) only applies "to conspiracies motivated by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'"  *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) (internal quotation marks omitted).   Hackett's conspiracy claim fails because he does not allege, let alone establish, that he is a member of a protected class, or that Defendants were motivated by racial or other improper class-based animus.   Furthermore, he has put forth no evidence of a conspiracy.

## B.  The Second Incident - August 15, 2006 Arrest

Regarding the Second Incident, Hackett contends that Officer Huerta, two "unknown officers," and Agent Caudill are liable to him under 42 U.S.C. §§ 1983 and 1985 for allegedly violating his Fourth, Fifth, and Fourteenth Amendment rights by engaging in a conspiracy to attempt to make him be an informant through an unlawful arrest, unlawful detention, and false imprisonment associated with the August 15 arrest.

To the extent Hackett is claiming that Officer Huerta's arrest, which was based on the bench warrant, and the resultant detention at the jail until Hackett paid the $28 fine violated the Fourth or Fourteenth Amendments, the Court concludes that Officer Huerta is entitled to absolute immunity. *See Valdez v. City & County of Denver*, 878 F.2d 1285, 1286 (10th Cir. 1989) (holding that officers who arrest a plaintiff pursuant to a facially valid contempt order are absolutely immune from suit).

> "Just as judges acting in their judicial capacities are absolutely immune from liability under [42 U.S.C. § ] 1983, . . . '[police officers] charged with the duty of executing a facially valid court order enjoy[ ] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order.'" *Turney v. O'Toole*, 898 F.2d 1470, 1472 (10th Cir.1990) (quoting *Valdez v. City & County of Denver*, 878 F.2d 1285, 1286 (10th Cir.1989)).  Even if the judge issued an erroneous bench warrant for arrest for failure to appear and for contempt, as plaintiff alleged, she must contest the legality of the warrant and appeal that judgment rather than sue the official responsible for executing the warrant.

*Carter v. Hobbs Police Dep't*, No. 97-2045, 134 F.3d 382, 1998 WL 31437, *1 (10th Cir. Jan. 28, 1998).  The Court has already determined that Judge Kiper was authorized to issue the bench warrant, any alleged procedural irregularities notwithstanding.  *See* Doc. 82 at 6.  Accordingly, Officer Huerta cannot be liable for carrying out Judge Kiper's order to arrest Hackett, and his subjective motivations for executing the warrant are irrelevant.  For that reason, it is also irrelevant whether Officer Huerta was actually responding to a report of shots being fired in the area or whether he was driving around looking for Hackett.  Hackett has failed to state a claim against Huerta, Caudill, or any other Defendant arising from his arrest, search, and detention based on the bench warrant.

### C.  The Third Incident - March 18, 2007 Traffic Stop and Arrest.

Hackett contends that Officers Quinones, Clarke, and Rodriguez are liable to him under § 1983 for "false arrest, unlawful detention, and false imprisonment," Complaint ¶ 86; and for "malicious prosecution," *id.* ¶ 90; and that Clarke is also liable to him for "fabrication of evidence" that lead to his arrest, *id.* ¶ 87.  He contends that the Artesia Police Department is liable to him under 42 U.S.C. § 14141 for its alleged "failure to train, supervise, enforce policies and procedures, and monitor the Defendant officers."  Complaint ¶ 91.  He urges liability against Mayor Pro Tem Burch for an alleged failure to keep him from harm under 42 U.S.C. § 1986 and for conspiracy under § 1985.  *Id.* ¶ 92.  He argues that there were no grounds for the impoundment because the Jeep did not affect public safety.  *See* Doc. 106 at 7–8.  The issues he raises with respect to summary judgment are:

I.     Whether the Jeep did not affect public safety;
II.    Whether the inventory search and tow of Jeep was unlawful;
III.   Whether there was a fabrication of evidence;
IV.    Whether there was false arrest and imprisonment as a result of fabrication of evidence;

V.    Whether conspiracy existed between Clarke, Rodrigues, Quinones, the Artesia Police Department, and the Pecos Valley Drug Task Force.

Doc. 106 at 13.

### 1. Impoundment of the Jeep.

Hackett challenges the impounding of the Jeep; the Defendants argue that the Jeep was impounded as a matter of public safety because it was not registered and lacked proof of insurance. "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman*, 428 U.S. at 369. The removal of vehicles in the interests of public safety is part of what the courts consider the "community caretaking function." *Id.* at 368. "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009) (internal quotation marks omitted).

Given the undisputed facts that the Jeep was unregistered[4], Hackett did not produce proof of insurance, and neither Hackett nor the passengers owned the Jeep according to the title Hackett produced, as a matter of law it was reasonable for Officer Quinones to remove it from the parking lot where it was stopped to prevent it from being driven on the streets, stolen, or vandalized. An

---

[4]  In his summary-judgment response, Hackett submitted an old registration from 2004 for the Jeep, which also lists the "JVW Trust" as the Jeep's Owner, but which is signed by "Sharla Billips" as the "registered owner." Doc. 106, Ex. 15. But Hackett testified that the JVW Trust stands for "Jan and Vickie Wade;" that the Jeep "is owned by me, but I put it into . . . the JVW Trust;" and that he does not have a written trust agreement and does not know who the beneficiary of the Trust is or who controls it. Doc. 100, Ex. I at 4-6. He also submitted part of an unsigned affidavit from "Dorothy Janet Wade" that states she gave Hackett "permission" to use the Jeep, but the affidavit does not state that Wade controls or is the Trustee or beneficiary of the JVW Trust, or that she is the actual owner of the Jeep. *See* Doc. 106, Ex. 6. But it is not necessary to determine who the actual owner is in deciding whether it was reasonable to impound the Jeep under the circumstances of this case.

uninsured vehicle is undoubtedly a hazard to other drivers, as reflected in New Mexico's statutory requirement that requires vehicles be insured.  *See* NMSA 1978, § 66-5-201.1 (1998) (stating that the "legislature is aware that motor vehicle accidents in New Mexico can result in catastrophic financial hardship").  Furthermore, vehicles driven in New Mexico must be registered.  *See* NMSA 1978, § 66-3-1(A) (2007) (requirement of registration).  Failure to produce valid registration may also be grounds to impound a vehicle.  *See United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997).

Though Hackett argues that the Jeep did not present a danger to public safety because it was—at that moment—parked, it would still have to be registered and insured before it could lawfully be driven away from the convenience store parking lot.  Hackett argues that Officer Quinones could have permitted one of the passengers to drive the vehicle away, but having a license would not have cured the problem of the vehicle's lack of registration and liability insurance, and there is no claim that either of the passengers owned the Jeep.  Similarly unavailing is Hackett's suggestion that Officer Quinones should have left the vehicle parked where it was.  *See United States v. Walker*, No. 03-5048, 81 Fed. Appx. 294, 297, 2003 WL 22674824, **3 (10th Cir. Nov. 13, 2003) (holding that police lawfully impounded vehicle located in area "where it could have inhibited business or been subject to theft or vandalism").  Thus, the undisputed facts demonstrate that Officer Quinones and the Artesia Police Department were lawfully carrying out their community caretaking function by impounding the Jeep.

### 2. Inventory of the Jeep.

When a vehicle is lawfully impounded, police routinely perform inventory searches.  *See Opperman*, 428 U.S. at 369.  Inventory searches serve three distinct functions: (1) to protect the owner's property "while it remains in police custody;" (2) to protect the police "against claims or

disputes over lost or stolen property;" and (3) to protect the police "from potential danger." *Id.* Given the benign purposes of inventory searches, the Fourth Amendment's probable cause requirement typically does not apply; such searches must simply be reasonable under the facts and circumstances of the case and carried out in accordance with standard procedures. *See id.* at 370 n.5, 374–75; *see also United States v. Andas-Gallardo*, 3 Fed. Appx. 959, 964 (10th Cir. 2001) (holding that an inventory search is well-defined exception to the Fourth Amendment's warrant requirement).

It is undisputed that the Artesia Police Department has a standard procedure for conducting inventory searches. *See* Doc. 106, Ex. 16 at 3. It also appears undisputed that the procedure was followed in this case. Further, the Visine bottle that Officer Clarke seized for field-testing was plainly in view in an open compartment. Accordingly, the inventory search of the Jeep, which led to the discovery of the Visine bottle, was reasonable and did not violate the Fourth Amendment.

### 3. Testing the contents of the Visine bottle.

Officer Clarke, who conducted the inventory search, stated in his report of the incident that he decided to test the contents of the Visine bottle because, through "training and experience, I know that liquid methamphetamine can be carried in a Visine bottle." Doc. 100, Ex. N. In his interrogatory responses, he states that "[j]ust prior to this incident [he] learned that controlled substances were being concealed in Visine bottles." *Id.* Ex. P at 2.

As discussed above, a chemical test for illegal drugs—regardless whether the result is negative or positive—is not recognized as a search under the Fourth Amendment. *See Jacobsen*, 466 U.S. at 122–23 ("A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy."); *United States v. Nicholson*, 144 F.3d 632, 636 (10th Cir. 1998) (accord). In this case, as in *Jacobsen*, the field test could only reveal the presumptive presence of an illegal substance. Although it is "probably safe to assume that

virtually all" such tests will result in a positive finding, even if the result is negative, nothing of special interest is revealed and no privacy interest is compromised. *Jacobsen*, 466 U.S. at 123. Thus, the testing of the Visine bottle contents did not violate the Fourth Amendment.

### 4. Arrest.

The issue of the arrest pursuant to the results of the field test presents a closer question. Hackett was arrested when Officer Clarke reported the allegedly positive test results to Officer Quinones. Warrantless arrests must be supported by "probable cause to believe a crime has been committed by the arrestee." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *Id.* (internal quotation marks omitted).

Here, Officer Quinones (the arresting officer) was entitled to rely on Officer Clarke's report of the allegedly positive field-test results of the Visine bottle to believe that Hackett possessed methamphetamine. *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (discussing an officer's right to rely on the "fellow-officer rule" regarding communicated, collective knowledge that will give rise to probable cause); *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (1st Cir. 1991) (holding that a positive field-test result may provide probable cause for arrest).

As noted, Hackett was arrested based on the report of positive test results to Officer Quinones. While Officer Quinones was entitled to rely on Officer Clarke's report, the question remains whether Officer Clarke's method of conducting the field test was an independent violation of Hackett's constitutional rights. As Hackett points out, and the Defendants concede, Officer Clarke apparently "misused" the field test and misread the results. *See* Doc. 109 at 10; July 14, 2009 Tr. at 19, lns. 6-8. The resolution of whether Officer Clarke is entitled to qualified immunity for a

false arrest, despite his errors turns, therefore, on whether his misuse of the test was a reasonable mistake, clear incompetence, or an intentional violation of the law, because, while the protection of qualified immunity "gives ample room for mistaken judgments," it does not protect "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986); *see Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). Hackett presents no direct evidence of Officer Clarke's bad faith in misusing and misreading the field test, and relies solely on the written instructions on the field test itself to support an inference that Officer Clarke must have been acting in bad faith.

Although Hackett vigorously contends that the instructions warn an officer that the field test is "not to be used for liquid samples," July 14, 2009 Tr. at 18, lns. 17-18, that is not what the instructions state. The instructions warn only that the test is not "**designed**" to be used with liquid samples. Doc. 106, Ex. 20. There are "caution" instructions printed immediately above the design "warning" instruction stating that if the field-test contents inadvertently make contact with skin, it should be flushed with water for fifteen minutes. *See id.* Thus the "design" warning may indicate only that it is not physically *safe* for an individual to use the test with liquid methamphetamine, thereby increasing the risk of spilling the liquid on skin. Critically, the field test does not **prohibit** its use with liquid methamphetamine, nor does it warn that using the test with liquid methamphetamine instead of a powdered form of the drug may result in a false-positive result. It is reasonable to assume that the chemical in methamphetamine that turns the test-kit material blue would do so whether the methamphetamine is in liquid or powder form. Further, under the circumstances where it was nighttime when Officer Clarke conducted the test, where Hackett has presented no evidence that Officer Clarke actually read the printed "warning" but disregarded it, and where Officer Clarke admitted that he had no previous experience involving an arrest where liquid

24

tested positive for a controlled substance, *see* Doc. 106, Ex. 18 at 2, the Court concludes as a matter of law that the single fact of a printed warning regarding the field-test's **design** is not sufficient to raise a genuine issue of material fact regarding plain incompetence or knowing violation of the law. *See Lamping v. Walraven*, No. 00-3424, 30 Fed. Appx. 577, 580, 2002 WL 409059, **3 (6th Cir. Mar. 12, 2002) (noting that merely because a field test result is later shown to be erroneous in subsequent laboratory tests does not raise an inference that the testing officer was lying when he said the field test was positive).

In determining whether Officer Clarke is entitled to summary judgment on Hackett's claim that he fabricated evidence to create probable cause for Hackett's arrest, the Court must examine whether Hackett has "presented sufficient evidence to create a fact question as to whether the officers fabricated evidence to arrest him." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). Again, the only evidence Hackett relies on is the existence of the warning on the printed instruction sheet. The Court concludes that this evidence, standing alone, is not sufficient to create a fact question whether Officer Clarke "fabricated" evidence, especially when there was, in fact, no "evidence" at all; there was only a mistaken belief that the Visine bottle, which undisputedly was located in the Jeep in plain view and not "fabricated" or "planted," contained methamphetamine. The fact that Officer Rodriguez again tested the liquid in the Visine bottle as soon as he obtained a search warrant and before proceeding with any prosecution and that he immediately released Hackett when the results were negative, also weighs against Hackett's claim that Officer Clarke intentionally fabricated evidence in concert with the other Officers to effect Hackett's prosecution. Officer Clarke is entitled to summary judgment and qualified immunity on the fabrication-of-evidence claim.

The Court notes, however, that although Defendants contend that they had other grounds

besides the field-test result to arrest Hackett under the totality of the circumstances, the record clearly indicates that the allegedly positive field-test result was the only basis for the arrest and that Hackett would have been cited and the Jeep impounded, but he would not have been arrested for the traffic violations.

### 5. Conspiracy.

Hackett also alleges there is a fact question as to whether a conspiracy existed between the officers, the Artesia Police Department, and the PVDTF. As discussed above, however, any federal conspiracy claim under § 1985 fails because Hackett has not alleged, much less shown, that he is a member of a protected class.

### 6. 42 U.S.C. § 14141.

Hackett also attempts to allege claims under 42 U.S.C. § 14141 against the Artesia Police Department. Section 14141 states:

> (a)     Unlawful conduct
> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.
>
> (b)     Civil Action by Attorney General
> Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1) has occurred, the Attorney General for or in the name of the Untied States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

42 U.S.C. § 14141. Hackett's claims under this statutory provision must be dismissed because § 14141 expressly provides only for a civil cause of action available to the Attorney General and does not create a private cause of action. *See Fudge v. Phoenicia Times*, No. 1:09-cv-0301, 2009 WL 2568576, at *2 (N.D.N.Y., Aug. 19, 2009); *Wright v. Taylor*, No. 08-5944, 2009 WL 2342567, at

26

*4 (E.D. Pa., July 28, 2009); *Gallacher v. Kisner*, No. 2:08 CV 845 TC, 2009 WL 2058432, at *5 (D. Utah, July 15, 2009); *Rangel v. Reynolds*, 607 F. Supp. 2d 911, 925 n.6 (N.D. Ind. 2009) ; *Davis v. Clearlake Police Dep't*, No. C-07-03365 EDL, 2008 WL 4104344, *9 (N.D. Cal., Sept. 3, 2008); *Leisure v. City of Reynoldsburg*, No. 2:07-cv-411, 2008 WL 4137961, *7 (S.D. Ohio, Aug. 29, 2008).

### 7. Claims against Mayor Burch.

Hackett asserts claims against Mayor Burch under 42 U.S.C. §§ 1985 and 1986, for his alleged failure to protect Hackett from the third arrest and to investigate the Incidents. *See* Complaint at 15. But, because a claim under section 1986 depends, among other things, upon the existence of a conspiracy under section 1985, the failure of Hackett's § 1985 conspiracy claims forecloses any claims under § 1986. *See Taylor v. Nichols*, 558 F.2d 561, 568 (10th Cir. 1977).

### III. STATE-LAW NON-CONSTITUTIONAL CLAIMS.

Hackett asserts violation of the New Mexico Tort Claims Act, NMSA 1978, § 41-4-12 (1976), for assault and battery, false imprisonment, false arrest, and malicious prosecution. Complaint at 1, ¶ 1. The bases of these state-law claims are his assertions that Officer Huerta's thumb-cuffing and pat-down in the First Incident, that Officer Huerta's search incident to the arrest and the arrest pursuant to the bench warrant in the Second Incident, and that Officer Quinones' handcuffing, detention, and arrest in the Third Incident were unlawful. Because the Court has concluded as a matter of law that reasonable suspicion supported the pat-down in the First Incident; that the arrest in the Second Incident was valid as a matter of law pursuant to the bench warrant; and that probable cause supported the arrest in the Third Incident, it follows that the touching, detention, imprisonment, and arrests were lawful, and Hackett's state-law claims must fail. *See Reynaga v. County of Bernalillo*, No. 94-2182, 1995 WL 503973, *2 (10th Cir. Aug. 25, 1995) (noting that, in

New Mexico, "a law enforcement officer is not civilly liable [on a claim for assault and battery] for using such force as may reasonably be necessary in the enforcement of law and the preservation of order") (internal quotation marks omitted); *State v. Johnson*, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54 (1996) (noting that, "when a police officer has reasonable grounds or probable cause to believe that an offense has been committed in his presence, his warrantless arrest does not become unlawful if the arrestee is later found to be innocent"); *Martinez v. Sears, Roebuck & Co.*, 81 N.M. 371, 373, 467 P.2d 37, 39 (Ct. App. 1970) (noting, in a civil case, that "[t]o support the determination of false imprisonment there must be evidence or a reasonable inference of unlawful interference with the personal liberty or freedom of locomotion of another").

Although he did not assert a claim for defamation in his Complaint, in his briefing Hackett contends that Officer Huerta is also liable for defamation arising out of his field testing of the glass pipe taken out of Hackett's pocket during the First Incident.  *See* Doc. 107 at 11, ¶ 34.  Hackett contends that although Officer Huerta allegedly stated in a "loud voice in the convenience store parking lot that the test showed positive for methamphetamine," Officer Huerta actually tested the pipe only for amphetamine.  *See id.*, Ex. 28.  Hackett does not contend that the pipe had not been used to smoke methamphetamine or that it would not also test positive for methamphetamine.  The Court takes judicial notice that "[m]ethamphetamine is an amine derivative of amphetamine." *United States v. Blake*, 116 F.3d 1202, 1203 (7th Cir. 1997).  Hackett presents no evidence that burned methamphetamine residue will not also test positive for amphetamine, thereby also indicating a positive  presence of methamphetamine, which indisputedly is the amphetamine-based substance smoked in glass pipes of the nature found in Hackett's pocket.  *Cf. United States v. Colunga*, No. 1:05-CR-4(1), 2009 WL 1269073, *2 (E.D. Tex. May 6, 2009) (noting that a defendant's "urine specimen . . . yielded a positive result for amphetamine/methamphetamine" after

28

the defendant admitted to using "ICE, a form of methamphetamine").  The Complaint does not state a claim for defamation, and the Court will not permit Hackett to amend his Complaint to add such a claim at this juncture, where no federal claims are viable.

## IV.  STATE-LAW CONSTITUTIONAL CLAIMS.

Hackett contends that Officers Huerta, Quinones, Rodriguez, and Clarke violated his rights under Article II, Section 10 of the New Mexico Constitution by executing unreasonable searches and seizures in connection with the three incidents described above**.**  New Mexico courts have interpreted the meaning of an unreasonable search or seizure in the same way the federal courts interpret it under the federal constitution by applying the two-prong test set forth in *Terry*.  *See State v. Funderburg*, 2008-NMSC-026, ¶ 12, 144 N.M. 37, 183 P.3d 922.  Recently, however, the New Mexico Court of Appeals analyzed an alleged search-and-seizure violation under the New Mexico constitution, and in explaining its ruling, departed from federal precedent articulated in *Whren v. United States,* 517 U.S. 806, 813 (1996), which held that an officer's subjective intent is not relevant regarding the reasonableness of his actions.  *See State v. Ochoa*, 2009-NMCA-002, ¶¶ 8, 12, 146 N.M. 32, 206 P.3d 143, *cert. granted*, 2008-NMCERT-012, 145 N.M. 572, 203 P.3d 103.  *Ochoa* permits the courts to examine the subjective motivation of an officer in making a traffic stop *if* the defendant supplies sufficient evidence of pretext.

> To determine whether a stop is a pretextual subterfuge, courts should consider the totality of the circumstances, judge the credibility of witnesses, weigh the evidence, make a decision, and exclude the evidence if the stop was unreasonable at its inception.  The totality of the circumstances includes considerations of the objective reasonableness of an officer's actions and the subjective intent of the officer-the real reason for the stop.  We are reminded that courts perform the task of identifying intent regularly in a variety of settings.  In the context of an alleged pretext stop, the officer's intent is determined like any other fact, based on the evidence presented and consideration of the factors we describe below.

> We believe that the following standard can identify an unreasonable,

29

pretextual stop.  First, the trial court must determine whether there was reasonable suspicion or probable cause for the stop.  As usual, the State has the burden of proof to justify the stop under an exception to the warrant requirement.  If the stop can be justified objectively on its face and the defendant argues that the seizure was nevertheless unreasonable because it was pretextual under the New Mexico Constitution, then the district court must decide whether the officer's motive for the stop was unrelated to the objective existence of reasonable suspicion or probable cause.  The defendant has the burden of proof to show pretext based on the totality of the circumstances.  If the defendant has not placed substantial facts in dispute indicating pretext, then the seizure is not pretextual.  If the defendant shows sufficient facts indicating the officer had an unrelated motive that was not supported by reasonable suspicion or probable cause, then there is a rebuttable presumption that the stop was pretextual.  The burden shifts to the state to establish that, based on the totality of the circumstances, even without that unrelated motive, the officer would have stopped the defendant.

Facts relevant to the totality of the circumstances may include the following: whether the defendant was arrested for and charged with a crime unrelated to the stop; the officer's compliance or non-compliance with standard police practices; whether the officer was in an unmarked car or was not in uniform; whether patrolling or enforcement of the traffic code were among the officer's typical employment duties; whether the officer had information, which did not rise to the level of reasonable suspicion or probable cause, relating to another offense; the manner of the stop, including how long the officer trailed the defendant before performing the stop, how long after the alleged suspicion arose or violation was committed the stop was made, how many officers were present for the stop; the conduct, demeanor, and statements of the officer during the stop; the relevant characteristics of the defendant; whether the objective reason articulated for the stop was necessary for the protection of traffic safety; and the officer's testimony as to the reason for the stop.  This is not an exhaustive list of pretext indicators, but some guiding factors relevant to the inquiry.

Where there is a factual finding of pretext, that the officer had a constitutionally invalid purpose for the stop which is not exempt from the warrant requirement, the stop violates the New Mexico Constitution, and the evidentiary fruits of the stop are inadmissible.

*Id.* ¶¶ 39-42 (citations, internal quotation marks, and bracket omitted).  "Undisputedly, a seatbelt violation constitutes sufficient objective justification for [a traffic] stop."  *Id.* ¶ 43.

Here, however, Hackett has not presented any evidence of unlawful motive or of any "pretext indicators."  *See id.* ¶ 41.  Officer Huerta properly articulated a reasonable suspicion that Hackett

could have been arming himself when he reached into the back of his truck during the First Incident, and that event preceded Officer Huerta's pat-down search. *See State v. Chapman*, 1999-NMCA-106, ¶¶ 16-18, 127 N.M. 721, 986 P.2d 1122 (upholding a protective frisk in the course of a routine traffic stop for a seat belt violation and noting that an officer may reasonably check for weapons to ensure personal safety as long as the officer bases his suspicion on identifiable, articulable facts that may include a description of the behavior and appearance of the individual stopped).

Regarding the Third Incident, under New Mexico law, Quinones' arrest and detention of Hackett was reasonable under the totality of the circumstances because the stop was lawful at its inception; the Visine bottle was in plain view during the inventory search; Officer Clarke's training informed him that liquid methamphetamine was being transported in Visine bottles; Officer Clarke indicated that the bottle's contents tested positive for methamphetamine; Hackett was stopped at 3:45 a.m. driving an unregistered, uninsured vehicle with no indication that Hackett was in its lawful possession; and Hackett had no valid identification. *See State v. Bomboy*, 2008-NMSC-029, ¶ 17, 144 N.M. 151, 184 P.3d 1045 (holding that, under the New Mexico constitution, "if following a lawful stop on a roadway, an item in an automobile is in plain view and the officer has probable cause to believe the item is evidence of a crime, the officer may seize the item"). There was no evidence of pretext during the Third Incident. For example, Quinones did not question Hackett about drugs or ask for Hackett's consent to search the Jeep upon stopping him, and he did not arrest Hackett until he received information indicating probable cause for Hackett's arrest from an officer performing a routine inventory. *See Ochoa*, 2008-NMCA-002, ¶ 41. The Defendants are entitled to summary judgment on Hackett's state-constitution claims.

## V. EVIDENTIARY AND OTHER ISSUES.

Hackett raises a variety of miscellaneous issues and also has moved to file surreplies to the

31

Defendants' replies to his responses.

Hackett contends that the motions for summary judgment should be denied because the Defendants failed to seek his concurrence before they filed certain of the motions, in violation of the Local Rules.  While parties should comply with the Local Rules, in this case, there was no prejudice to Hackett from the failure to seek his concurrence, and it is clear that he vigorously opposes summary judgment.  Thus, though Defendants should have attempted to confer with him prior to filing the motions, their failure to do so is not grounds to deny summary judgment.

Hackett also points out that Defendants failed to highlight their exhibits as required by the Local Rules.  This Local Rule is for the convenience of the Court.  *See* D.N.M. LR-Civ. 10.6.  The absence of highlighting did cause any undue convenience in evaluating the motions and does not provide a basis to deny them.

Hackett contends that he was denied access to discovery, specifically, to Agent Caudill's phone log and to what a note said that Officer Quinones passed from another officer to Walters when Walters was a passenger in Hackett's Jeep during the Third Incident.  But Hackett never sought to compel production of any of this information.  Further, Quinones denied knowledge about the contents of the note, and neither the phone log nor the contents of the note is of apparent relevance to any issue in this case.  The information Walters allegedly received would not have vitiated the grounds for the traffic stop, the citations, the Jeep's impoundment and search, or Hackett's arrest because of the allegedly positive field test.  And because the Court accepted as true Hackett's contention that he called Agent Caudill in granting summary judgment on the coercion claim, the phone log that confirmed the call would not have changed the result.

Hackett also complains that a discovery stay imposed by Judge Scott prevented him from obtaining discovery information to support his claims, in particular, the courts' telephone logs.  The

stay, however, applied only to Defendants Kiper and Hatfield.  *See* Doc. 39.  It did not prevent Hackett from seeking discovery from other parties.  Furthermore, Kiper and Hatfield have been dismissed, and the telephone logs he seeks are not relevant to the claims against the Artesia Defendants.

Hackett objects to the affidavits of Dekka House and Bonnie Sanders, contending that they were not signed under penalty of perjury pursuant to 28 U.S.C. § 1746.  This objection is without merit.  The affidavits were sworn and subscribed before a notary and bear a notary stamp.  *See* Doc. 100, Exs. B-1, B-2.  Thus, they are not unsworn declarations that must comply with 28 U.S.C. § 1746.

Finally, Hackett objects to the transcript of the First Incident traffic stop on the grounds that Defendants have not provided the credentials of the transcriber.  But he does not dispute the accuracy of the transcription, and his objection is without merit.  "Transcripts, like other evidence, must be properly authenticated before they can be admitted."  *United States v. Devous*, 764 F.2d 1349, 1354–55 (10th Cir. 1985); *see also* FED. R. EVID. 901(a).  "The testimony of either the stenographer (transcriber) or a participant in the actual conversation that the transcript is correct is sufficient to authenticate."  *Devous*, 764 F.3d at 1355.  House's affidavit states that the transcript is correct, thus, under *Devous*, her certification suffices to authenticate the transcript.  There appears to be no separate requirement that the transcriber be "certified" to make transcriptions, as Hackett suggests.

Hackett seeks leave to file surreplies to supplement his responses with citations to legal authority.  *See* Doc. 113 at 2.  As demonstrated by his thorough and voluminous response briefs, complete with exhibits, Hackett has done a fair job of opposing summary judgment, and the Court has independently reviewed the controlling law because of Hackett's pro se status.  The Defendants

33

did not raise any new arguments in their reply briefs, which usually is necessary before a surreply is permitted.  The Court will deny his motion to file surreplies.

**NOW, THEREFORE, IT IS ORDERED** that the *Artesia Defendants' Motion for Summary Judgment on Plaintiff's Federal Law Claims* (Doc. 100) is GRANTED; the *Artesia Defendants' Motion for Summary Judgment on Plaintiff's State Law Claims* (Doc. 101) is GRANTED; *Defendants Huerta, Quinones, Clarke, and Rodriguez's Motion for Summary Judgment on Plaintiff's State Law Constitutional Claims* (Doc. 112) is GRANTED; Hackett's *Motion for Leave to File Surreplies* (Doc. 113) is DENIED; Hackett's *Motion for Clarification and Entry of Final Judgment* (Doc. 122) is DENIED AS MOOT; and Hackett's *Motion to Correct the Docket* (Doc. 124) is DENIED AS MOOT.

**SO ORDERED** this 23rd day of September, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge